REID COLLINS & TSAI LLP
Jeffrey E. Gross
P. Jason Collins
810 Seventh Avenue, Suite 410
New York, NY 10019
Tel.: 212.344.5200

Jordan L. Vimont, Sr. *(pro hac vice forthcoming)*
Rachel A. Buchhorn *(pro hac vice forthcoming)*
1301 S. Capital of Texas Hwy
Building C, Suite 300
Austin, Texas 78746
Tel.: 512.647.6100

*Counsel to Joint Official Liquidators of Madison Asset LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>MADISON ASSET LLC,<br><br>    Debtor in a Foreign Proceeding. | Chapter 15 Case<br><br>Case No. 18-12814 (MEW) |
| MARTIN NICHOLAS JOHN TROTT and CHRISTOPHER JAMES SMITH, on behalf of and solely in their capacity as the Foreign Representatives and Joint Official Liquidators of MADISON ASSET LLC (IN LIQUIDATION),<br><br>    Plaintiffs,<br><br>    v.<br><br>DEUTSCHE BANK AG,<br><br>    Defendant. | Adv. Proc. No. _____ |

## COMPLAINT

Plaintiffs Martin Nicholas John Trott and Christopher James Smith ("Plaintiffs" or the

"JOLs"), solely in their capacity as the Foreign Representatives and Joint Official Liquidators of

Madison Asset LLC ("Madison"), a Cayman investment fund that is now in official liquidation

proceedings before the Grand Court of the Cayman Islands, bring claims against Deutsche Bank

AG ("Deutsche" or "Defendant") for fraudulent trading under § 147 of the Cayman Islands Companies Law (2012 Revision, as amended), and respectfully allege as follows:

## I. INTRODUCTION

1.  The JOLs, on behalf of Madison, bring this case against Deutsche for its role in a fraudulent trading scheme orchestrated by Madison's former principals and principals of related entities between 2014 and 2017 that caused Madison to suffer more than $200 million in damages. As Madison's bank for custodian accounts, Deutsche had knowledge that Madison's accounts were being used to perpetuate a fraudulent scheme. Instead of halting the scheme and refusing to take part, Deutsche turned a blind eye, continued processing wrongful transfers, and utterly failed to follow any modicum of proper procedures or oversight with respect to Madison's accounts. This reckless failure of oversight in the face of glaring red flags ████████████ ████████████████████████████████████████████████████████████████.

## II. PARTIES

**A.  PLAINTIFFS**

2.  The JOLs are the foreign representatives of Madison Asset LLC, an exempted company limited by shares formed on or about January 2, 2014 under the Cayman Islands Companies Law. Madison was established as an investment company to provide financial advice and management to the Ibero-American markets.

3.  On March 12, 2018, Westwood Capital Markets S.A. and Seguros Sucre S.A. (together the "Liquidation Petitioners") presented a petition to the Grand Court of the Cayman Islands (the "Grand Court") requesting that Madison be wound up pursuant to Part V of the Companies Law (2018 Revision).

4. On July 4, 2018, the Grand Court ordered that Madison be wound up and that Martin Nicholas John Trott of RHSW (Cayman) Limited be appointed as Madison's official liquidator. Shortly thereafter the Grand Court appointed Christopher James Smith of RHSW (Cayman) Limited as a joint official liquidator.

5. As part of their role, the JOLs sought, and the Grand Court granted, leave to obtain recognition of the Cayman Islands proceedings with the United States Bankruptcy Court.

6. After receiving the Grand Court's permission, the JOLs instructed United States counsel to file a petition with the United States Bankruptcy Court for the Southern District of New York (the "New York Bankruptcy Court") seeking recognition of the Company's Cayman Islands liquidation proceeding ("Cayman Proceeding") as a foreign main proceeding under Chapter 15 of the United States Bankruptcy Code (the "Bankruptcy Code").

7. On October 16, 2018, the New York Bankruptcy Court granted recognition of the Cayman Proceeding as a foreign main proceeding under Chapter 15 and found that the JOLs had demonstrated that they were Madison's duly authorized foreign representatives, as defined by section 101(24) of the Bankruptcy Code.

**B.    DEUTSCHE**

8. Deutsche Bank AG is a German global banking and financial services company with a branch at 60 Wall Street, New York, NY.

### III.    JURISDICTION AND VENUE

9. This Court has jurisdiction over Deutsche pursuant to 28 U.S.C. § 1334(b).

10. Venue lies in this county pursuant to 28 U.S.C. §§ 1391 & 1409.

## IV. FACTUAL BACKGROUND

### A. THE BISCAYNE GROUP OF COMPANIES

#### 1. The Real Estate Development Company

11. Roberto G. Cortes ("RG Cortes") and Ernesto H. Weisson ("Weisson") were the founders, principals, and beneficial owners of a now-failed South Florida-based residential real estate development company, South Bay Holdings, LLC ("South Bay").

12. When founded in 1999, South Bay financed its activities primarily through commercial bank loans and investments from friends and family.

13. In 2006 and 2007, South Bay sought to significantly expand, including by acquiring lots and associated memberships at an exclusive resort in Key Biscayne, Florida.

14. To expand and pursue its acquisition plans, South Bay needed additional funding, which led RG Cortes and Weisson to look to Biscayne Capital, their now-defunct group of investment advisory companies.

15. By training and experience RG Cortes, Weisson, and RG Cortes's brother, Juan C. Cortes ("JC Cortes," collectively, the "BCI Principals") were brokers and investment advisors.

16. From 2005 to 2008, the BCI Principals formed and operated several non-U.S. investment advisory firms for high net worth individuals that operated under some variation of the name "Biscayne Capital."

#### 2. The U.S.-Based and Registered Investment Advisor

17. In 2008, the BCI Principals created their first U.S-based and registered investment advisor, Biscayne Capital International, LLC ("BCI"). Headquartered in Miami, Florida, BCI was formed to provide wealth management and investment advisory services

4

primarily to non-U.S. Latin American individuals. RG Cortes served as BCI's CEO and JC Cortes as its Chief Compliance/Operations Officer, with Weisson and RG Cortes and JC Cortes's father, Roberto Cortes Rueda ("Rueda"), serving as board members.

18.    To manage client funds and assets, BCI had custodian arrangements with several banks, including Pershing LLC (Bank of New York Mellon), Deutsche Bank, and Raymond James. Under these arrangements, the accounts were owned by clients, but BCI as the broker or investment advisor had authority to manage the investments in the account (*i.e.,* buying and selling securities, transferring funds to a client's associated bank account).

### 3.    The Special Purpose Vehicles

19.    As investment advisors, the BCI Principals had the ability to steer client funds into the investments that the BCI Principals preferred. Thus, as South Bay began seeking additional capital to fund expansion plans in 2006 and 2007, the BCI Principals began forming special purpose vehicles (each a "Preferred SPV") that would create and offer securities preferred by the BCI Principals.

20.    Typically formed under the laws of the Cayman Islands or the British Virgin Islands ("BVI"), each Preferred SPV was beneficially owned or controlled by the BCI Principals. Once formed, the BCI Principals would cause the Preferred SPV to prepare offering memoranda and seek to raise capital by selling securities with the stated purpose of raising funds to invest in South Bay to support its development activities. To attract investors, the Preferred SPV's securities typically promised to pay periodic interest or a regular dividend.

### 4.    The Scheme Begins

21.    In their role as investment advisors and wealth managers, the BCI Principals promoted the Preferred SPVs and steered clients into purchasing securities from the Preferred

5

SPVs. When a BCI client invested in a Preferred SPV, it was lucrative for BCI, as a BCI affiliate, such as Biscayne Capital, S.A., typically acted as the underwriter for the SPV offering and charged a fee for doing so. As a result, a BCI client that invested in a Preferred SPV would pay BCI an underwriting fee in addition to a regular management fee.

22. RG Cortes and Weisson owned South Bay, which—in addition to holding real estate—was the majority beneficial owner of BCI alongside other minority owners, JC Cortes and another BCI investment adviser, Frank Chatburn ("Chatburn").

23. As a holding company of BCI and other Biscayne entities, South Bay provided millions of dollars in capital contributions to BCI to pay advisors and maintain its appearance as a sophisticated investment advisory firm. Thus, as the BCI Principals used BCI to steer their clients' funds into the Preferred SPVs, the Preferred SPVs would fund South Bay, which in addition to funding real estate development, funded BCI.

24. As a U.S.-registered investment advisor, this common beneficial ownership and connected control alone (between South Bay, BCI, and the Preferred SPVs) should, at a minimum, have resulted in disclosures to clients. To continue their ability to solicit client funds for South Bay and BCI, the BCI Principals were instead careful to suppress any disclosure of these conflicts of interest. Rather, they engaged in a practice of concealment and deception that intensified as the global economic conditions deteriorated in late 2008.

**5.    The BCI Principals Double Down On the Scheme**

25. By 2009, the combination of the global financial crisis, disruption of the South Florida real estate market, and development delays with the resort left South Bay in a highly vulnerable financial condition. Instead of admitting to clients and investors that they had lost a significant amount of money on their real estate investments—or that they were wrongfully

6

misappropriating funds along the way—the BCI Principals doubled down on the fraudulent scheme.

26.   The BCI Principals formed more entities and caused the Preferred SPVs to issue new securities and raise funds to pay interest to legacy investors to cover their failures and perpetuate the scheme. These entities include the following:

- Spyglass Investment Management Ltd., a BVI advisory firm ("Spyglass"),

- Sentinel Investment Fund Ltd., a Cayman investment fund ("Sentinel"),

- SG Strategic Income Ltd., a Cayman investment fund ("SGS"),

- Diversified Real Estate Development Ltd. ("Diversified"),

- GMS Global Step Up Note, Ltd., a Cayman investment fund ("GMS"), and

- Preferred Income Collateralized Interest Ltd. ("Preferred").

Each of these entities—BCI, Spyglass, Sentinel, SGS, Diversified, GMS, and Preferred (together with other Preferred SPVs, the "Biscayne Group of Companies")—was integral to the BCI Principals' scheme to conceal South Bay's failed investments and their own misappropriations.

27.   The BCI Principals and various BCI and Spyglass representatives continued to direct investors to invest in the Preferred SPVs, which in turn transferred money to South Bay to allow it to conceal its financial difficulties by paying interest payments or repaying old investors who requested redemptions or withdrawals. New money was continually raised in order to maintain a complex effort to conceal failure and to facilitate ongoing misappropriation. New investors were obviously not told that their money was going towards a scheme to conceal a massive real estate investment failure or to fund ongoing misappropriations by the BCI Principals. Investors thought they were investing in a real project with prospects of success and the scheme itself lasted for a lengthy period.

28.     Although the original real estate development failed in the 2007-2008 timeframe, new funds and offerings were established in 2008, 2010, 2012, 2015, etc., as new vehicles were needed to raise more and more money.

B.    **MADISON ASSET LLC**

   6.    **Madison Forms Amidst SEC Inquiry into BCI's Activities**

29.     At the time of Madison's formation in January 2014, the SEC had already begun an inquiry into the activities of BCI and several of the Preferred SPVs. This inquiry turned into an investigation, leading the BCI Principals to form a new entity, Madison, that was outside the reach of U.S. regulators and could serve as a clearinghouse for cash and securities for their scheme. Thus, Madison was formed to serve a role similar to that of BCI. Held out as a financial services company that provided advice to the Ibero-American markets, Madison purported to serve as a broker and promoter within the Biscayne Group of Companies.

30.     RG Cortes and JC Cortes's father, Rueda, is shown as the initial beneficial owner and director of Madison in its formation documents.

   7.    **Madison Opens Accounts with Deutsche**

31.     Rueda had an established relationship with Deutsche and, shortly after forming Madison, Rueda caused Gustavo Trujillo ("Trujillo") to open a custodian account for Madison with Deutsche's New York City Branch under a certain Multi Market Custody Agreement (the "Custody Agreement," attached as Exhibit A), dated March 7, 2014, together with an E-Mail Addendum (the "Addendum," attached as Exhibit B) executed as of the same date. Rueda signed the Custody Agreement on behalf of Madison, and also provided Deutsche with a copy of Madison's management structure, which listed himself as the "Director – Shareholder,"

8

Fernando Haberer Bergson ("Haberer") as the "General Manager," and Trujillo as the "Operations Manager."

32.  Pursuant to this Custody Agreement, Deutsche set up an account in the name of Madison with subaccounts for each of the Biscayne Group of Companies. In total, Deutsche set up twenty-nine (29) subaccounts for various Preferred SPVs and other entities within the Biscayne Group of Companies that Madison managed. *See* Account List, Exhibit C. Due in part to Deutsche's relationship with Rueda, Deutsche opened the Madison subaccounts without following industry standard know-your-customer procedures.

33.  For example, it was not until after the subaccounts were opened ███████ ████████████████████████████████████████████████████████ ████████████████████████████████ Still, Deutsche clearly knew at the time the accounts were opened that Madison and its principals were closely related to the Biscayne Group of Companies. Among other things, the request to open accounts for Madison was reflected in a series of emails from Trujillo that: (1) describe Trujillo as the Vice President of "Operations and Trading" for one the Biscayne Group of Companies; (2) note that Madison was an entity "related to the Biscaynes group"; and (3) state that Rueda, Madison's shareholder, was also "a director and shareholder in BiscayneCapital."

34.  ████████████████████████████████████████████████████



35.    Hundreds of large cash transfers were made through these Deutsche subaccounts. Deutsche's lax oversight associated with the opening of the subaccounts carried over to a reckless failure of oversight with respect to the use of the subaccounts themselves.

**8.    Trujillo Ascends as Madison's Beneficial Owner**

36.    Toward the end of 2015, the BCI Principals asked Madison's "Operations Manager," Trujillo, to take over Rueda's position and become the beneficial owner and principal of Madison. This request was not surprising, as Trujillo had a long history of working with and for the BCI Principals. At the time of the BCI Principals' request, Trujillo had worked with RG Cortes and Rueda for almost 15 years. Trujillo started in the operations department of the Cortes family's insurance company as a 21-year-old, despite having no professional degree or other credentials qualifying him to work in insurance, financial management, or investment administration. Over time, Trujillo became a key, trusted figure in the Cortes family's business dealings, including those related to the Biscayne Group of Companies.

37.    Trujillo agreed to replace Rueda as the beneficial owner of Madison and to oversee Madison's operations under the direction of the BCI Principals.

**9.    Trujillo Carries On the Scheme Via Instructions to Deutsche, Using the Deutsche Subaccounts**

38.    As directed by the BCI Principals, Trujillo continued using Madison to direct transfers and to carry out the scheme to conceal the investment failure and the misappropriations of the BCI Principals.

39.    In April 2019 Trujillo was charged with—and pleaded guilty to—wire fraud and money laundering for his role in the sale of investments tied to the real estate development through the Biscayne Group of Companies. *See* Trujillo Criminal Information, Exhibit D. In the

11

course of Trujillo's criminal proceedings, more details were revealed that showed how Madison was used as a vehicle to continue carrying out the fraudulent scheme.

40. According to the charging document, throughout 2015 and 2016, Trujillo executed the sale of investments "knowing that the real estate projects purportedly funded by the Cayman Islands Funds were insolvent and had no reasonable prospect of generating returns." And he created false and fraudulent bank statements that purported to show that clients' funds were "safely invested in the Cayman Islands Funds" and he made purported interest payments to clients "to deceive them into believing that their investments were generating returns, when in fact their money was not invested in real estate and was not generating returns."

41. Trujillo also allowed Madison accounts to be used for corrupt payments to government officials. For example, Madisons' accounts were used to disguise bribes for a client who rigged a bid for a contract with PetroEcuador. In furtherance of this scheme, Trujillo facilitated a transfer into the Madison accounts of approximately $2.9 million in contract proceeds from PetroEcuador and then he "wired and caused to be wired at least $2.3 million" from the accounts "to repay certain…clients and other debts."

42. Trujillo orchestrated numerous other fraudulent transfers using the Madison accounts in 2015 and 2016 through instructions to Deutsche, which had visibility into all transfers between and among the Biscayne Group of Companies and the BCI Principals through the Madison accounts.

C.   **DEUTSCHE FAILS TO RESPOND TO SEC CEASE-AND-DESIST ORDER**

   10.   **SEC Finds Violations of Federal Securities Laws and Imposes Sanctions Against Madison's U.S.-Counterpart, BCI**

43. After a lengthy inquiry into the Biscayne Group of Companies, the SEC publicly entered an order dated May 26, 2016, in which the Commission detailed its findings that BCI,

12

the BCI Principals—including RG Cortes, Weisson and JC Cortes—together with Chatburn committed multiple violations of the federal securities laws. *See* SEC Order, Exhibit E. The Commission found, *inter alia*, that the common beneficial ownership and effective control of BCI, certain Preferred SPVs, and South Bay created multiple conflicts of interest for BCI that should have been disclosed when BCI and the BCI Principals recommended and sold shares issued by the Preferred SPVs to BCI's clients. The Commission also found that:

(1) South Bay's calamitous financial condition from 2010 through 2012—and BCI's dependence on South Bay for financial support during this time—created conflicts of interest that should have been disclosed.

(2) RG Cortes and JC Cortes wilfully aided and abetted and caused BCI to make material misrepresentations about BCI and certain of the Preferred SPVs.

Of course, none of the conflicts were disclosed to BCI clients nor were misrepresentations corrected, and the Commission determined that these failures constituted willful violations of Sections 206 and 207 of the Advisers Act.

44.     As a result of its findings, the Commission imposed both monetary penalties and sanctions on BCI, the BCI Principals, and Chatburn, including that each "cease and desist from committing or causing any violations and any future violations" of Sections 206 and 207 of the Advisers Act. The BCI Principals and Chatburn were also "barred from association with any broker, dealer, [or] investment adviser" and "prohibited from serving or acting" in a role for a registered investment company for a minimum of three years. The Commission further assessed disgorgement and civil money penalties against BCI, the BCI Principals, and Chatburn.

**11.     Deutsche Closes Some Biscayne Group of Companies' Accounts in Response to SEC Order, Allows Others—like Madison's—to Stay Open**

45.     Following publication of the SEC Cease-and-Desist Order, Deutsche closed a limited set of accounts held by affiliates of the Biscayne Group of Companies. Related accounts at Deutsche, however, were apparently reviewed but allowed to stay open—and this was despite the fact that Deutsche's scrutiny of the Biscayne Group of Companies' accounts had begun prior to the entry of the SEC Order. Indeed, in January 2016 (four months before the SEC Order), Deutsche had expressed concern with the number of wires, unusual activity, and the hundreds of purported beneficiaries for Madison and Biscayne Bahamas. And in February 2016, Deutsche notified Trujillo that Deutsche's risk and compliance group had flagged this issue and it could no longer process wires from custodian subaccounts that were unrelated to Madison's and Biscayne's custodian securities activity.

46.     The same month the SEC Order was entered (but still prior to its entry) Deutsche requested files from South Bay and Preferred in connection with a "periodic review." The files Deutsche requested included items such as the memorandum of association, most recent shareholder registrar, and proof of list of directors. ███████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████ Thus, by the time of the entry of the SEC Order, Deutsche ███████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████

47.     And upon learning of the SEC Order, Deutsche had clear knowledge of key aspects of the scheme, including that the BCI Principals: (1) had failed to disclose a myriad of

14

conflicts of interests to clients and investors in Preferred SPVs; (2) had made key omissions and misrepresentations about the ownership, operating history, and financial performance and prospects of certain Preferred SPVs; and (3) were using certain Preferred SPVs to fund a failing enterprise without full disclosure to clients and investors. Deutsche further knew that through the subaccounts it maintained for Madison, it was continuing to be a key participant in the scheme, ███████████████████████████████████████████████████████████████ ██████████████████████.

48. Despite failing to obtain all requested documentation for related entities, learning of the securities violations in the SEC Order, knowing subaccounts were ████████████ ███████████████████████████████, and taking action to close a limited set of accounts based on information in the SEC Order, Deutsche took no action to stop the scheme. Instead, Deutsche ████████████████████████████████████████████████ kept all of the accounts and subaccounts open, including subaccounts for the Biscayne Group of Companies referenced in the SEC Order.

### 12. Deutsche Requests, But Does Not Receive, KYS and AML Documentation for Madison-Managed Entities

49. After the SEC Order, Deutsche compliance and anti-money laundering personnel made additional requests to Trujillo for information on the Madison-managed entities and related account activity. These requests included the latest available financials and documentation showing the ownership structure for different Madison-managed entities in November 2016, January 2017, and June 2017. At each juncture, representatives for the Madison-managed entities either did not respond, stalled and made excuses, or sent incomplete information such that Deutsche's information requests remained outstanding for several months.

50. After certain early-June requests for updated documentation, on June 15, 2017, Deutsche finally provided notice to Madison that it was terminating the Custody Agreement effective August 31, 2017, and closing Madison's cash and custody accounts "[a]s soon as practicable" after the termination date. *See* Deutsche Bank Termination of Custodian Services, Exhibit F.

D. **DAMAGES/TRANSACTION ANALYSIS**

51. The Custody Agreement contemplated that the subaccounts would be used to hold and transfer cash to facilitate trading and settlement activity associated with Madison's purported custodial and investment advisory services. Activity in the subaccounts would, therefore, be expected to be limited to two types of cash transfers: (1) transfers with bank accounts owned by Madison or the funds it managed; and (2) transfers with trading counterparties. ████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████

52. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████

53. ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████

54. ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████

55. *Fourth*, after the SEC Order publicly revealed that Madison and its principals were using Madison's accounts to facilitate fraudulent and corrupt financial transactions, Deutsche ████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████

56. In total, Madison ████████████████████████████████ has been the recipient of over $200 million in liquidation claims resulting from the carrying on of its business in a fraudulent manner to which Deutsche was a knowing participant.

### COUNT ONE: FRAUDULENT TRADING
(Cayman Islands Companies Law § 147)

57. Plaintiffs repeat and re-allege all of the allegations set forth in the preceding paragraphs of the Complaint as if fully set forth herein.

58. Trujillo managed Madison with the intent to defraud its creditors and engage in fraudulent transactions at the direction of the BCI Principals. In particular, Trujillo: (1) executed the sales of investments knowing that the real estate projects purportedly being funded were insolvent and had no reasonable prospect of generating returns; (2) created false and fraudulent bank statements to show that the clients' funds were safely invested in the various funds; and (3) made purported interest payments to clients so the clients would believe that their investments were generating returns when, in fact, they were not.

59. As set forth above, Deutsche facilitated the transfers from Madison and substantially assisted Trujillo in his actions taken with an intent to defraud Madison's creditors and with fraudulent purposes. As described, Deutsche knew, among other things, that: (1) the Madison custodian accounts were not being used as contemplated by the Custody Agreement; (2) of the Madison subaccounts for which it had information, ███████████████████ ███████████████████████████████████████████████████████████ (3) the SEC issued a Cease-and-Desist order to RG Cortes, Weisson, and JC Cortes for willful violations of U.S. Securities laws; and (4) RG Cortes, Weisson, and JC Cortes were using the Biscayne Group of Companies to fund a failing enterprise, and that the funds to do so were obtained from investors through misrepresentations and omissions. Yet, Deutsche ██████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████

60. Pursuant to section 147 of the Cayman Islands Companies Law (2012 Revision, as amended), the court may declare that Deutsche is "liable to make such contributions" to Madison "as the Court thinks proper." Deutsche was a knowing participant in the fraudulent trading scheme perpetrated at Madison that facilitated transfers made with the intent to defraud the Madison's creditors and to carry on Madison's business with a fraudulent purpose ███ ████████████████████████████████ █████ As a result, Deutsche should be required to make a contribution to Madison in an amount equal to the loss that it suffered through the carrying on of its business in a fraudulent manner, at least $200 million.

### V. NOTICE OF INTENT TO RAISE ISSUES UNDER FOREIGN LAW

61. Pursuant to Rule 44.1 of the Federal Rules of Civil Procedure, the JOLs hereby give notice of their intent to raise issues under Cayman Islands law, including but not limited to, their claim for Madison carrying their business with the intent to defraud creditors with a fraudulent purpose pursuant to section 147 of Cayman Companies Law. The JOLs intend to offer expert testimony, documents, and other relevant material or sources to the Court to determine the foreign law at issue.

### VI. JURY DEMAND

62. Plaintiffs demand a jury trial on all contested issues of fact.

### VII. RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that a judgment be entered on their behalf against Defendant for the following:

a. A contribution to Madison pursuant to Section 147 of the Cayman Islands Companies Law;

b. Pre-judgment and post-judgment interest at the highest rate allowed by law; and

c. Any and all such further relief to which Plaintiffs are entitled at law and in equity.

Dated: October 14, 2020
New York, New York

**REID COLLINS & TSAI LLP**

/s/ *Jeffrey E. Gross*
Jeffrey E. Gross
P. Jason Collins
810 Seventh Avenue, Suite 410
New York, NY 10019
Tel.: 212.344.5200
jgross@reidcollins.com

Jordan L. Vimont, Sr.
(*pro hac vice* to be filed)
Rachel A. Buchhorn
(*pro hac vice* to be filed)
1301 S. Capital of Texas Hwy
Building C, Suite 300
Austin, Texas 78746
Tel.: 512.647.6100

*Counsel to Plaintiffs*